**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RAIMEE MARMILLION** | § | **PLAINTIFF** |
| | § | |
| **v.** | § | **Civil Action No. 1:07CV1132-LG-RHW** |
| | § | |
| **AMERICAN INTERNATIONAL** | § | |
| **INSURANCE COMPANY; WILLIS** | § | |
| **NORTH AMERICA, INC.; and** | § | |
| **AIG MARKETING, INC.** | § | **DEFENDANTS** |

**MEMORANDUM OPINION AND ORDER**

**BEFORE THE COURT** is the Motion for Summary Judgment [115] and the Motion to

Exclude Certain Expert Testimony of Wayne Davidson [117] filed by the defendants, American

International Insurance Company and AIG Marketing, Inc. (hereinafter collectively referred to as

"AIG").  Upon reviewing the submissions of the parties and the relevant law, the Court finds that

the Motion for Summary Judgment should be granted in part and denied in part and that the

Motion to Exclude should be granted.

INTRODUCTION

This lawsuit arose out of the denial of a homeowner's insurance claim for damage caused

by Hurricane Katrina.  The primary issues presented in this lawsuit are: (1) whether the plaintiff's

homeowner's policy was properly canceled for nonpayment of premium prior to Hurricane

Katrina where AIG sent premium bills to an incorrect address; (2) whether there were sufficient

credits on the account to fund the homeowner's policy when it was canceled; and (3) whether

AIG acted in bad faith when it denied the plaintiff's insurance claim.[1]

_____

[1] AIG does not assert that coverage would be precluded by any exclusion in the policy.
Therefore, the question of whether the damage to the house was caused by wind or water is not at
issue in this case.  (Ex. C to Pl.'s Resp.)

FACTS

The plaintiff, Raimee Marmillion, purchased four insurance policies from AIG in October of 2003: an automobile policy,[2] a homeowners policy covering her house in Bay St. Louis, Mississippi, a homeowners policy covering her house in Metairie, Louisiana, and an excess policy. All four of the policies were billed together.[3] The defendant, Willis North America, Inc., was the agency that procured the policies for Marmillion.[4]

On December 22, 2003, Rebecca Freedman, an employee of Willis, asked AIG to change the "billing address"[5] for the Mississippi homeowners policy to P.O. Box 8470, Metairie, Louisiana 70010, which was Marmillion's ex-husband's business address. (Ex. C to AIG's Mot. at 3). On March 29, 2004, Freedman requested that the "mailing address" for Marmillion's billing account be changed to 406 N. Beach Boulevard, Bay St. Louis, Mississippi 39520, which was the address for Marmillion's house in Mississippi. (*Id.* at 9).

On November 24, 2004, another Willis employee, Cathy Guilfo, asked AIG to change the "insured address"[6] for all policies to 6305 South Cliff, Fort Smith, Arkansas 72903, which was

---

[2] The automobile policy initially covered a Mercedes Benz S500 and a Mercedes Benz G500. A Cadillac Escalade was added to the policy on March 5, 2004, but deleted at Marmillion's request in April of 2004. (Ex. A to AIG's Mot. at 28-29).

[3] Marmillion purchased the policies soon after her divorce from William Hines. Her name is listed as "Raimie Hines" on the policies and billing statements.

[4] Willis has also filed a Motion for Summary Judgment.

[5] AIG views its policies as having two types of addresses: the "billing address," which is where bills are sent, and the "policy mailing address," which is where notices of cancellation and policies are sent. (Ex. T to Pl.'s Resp. at 24-25).

[6] "Insured address" was the terminology used by Mr. Guilfo in her request.

the business address of Marmillion's fiancé.  (Ex. E to AIG's Mot.)  At her deposition, Guilfo

testified that she intended to change the address on Marmillion's policies and billing statements.

(Ex. F to AIG's Mot. at 49).  Only the policy mailing address was changed by AIG.  (Ex. G to

AIG's Mot. at 54-57).  All of the billing statements for the 2004 through 2005 policy period were

sent to Marmillion's ex-husband's business address.

     The installment plan applicable to Marmillion's policies provided that forty percent of the

premium was to be paid in the first installment, and twenty percent was to be paid in the three

remaining installments.  (Ex. I to AIG's Reply at ¶7).  AIG required that the entire premium be

paid within the first six months of the policy period.  The first billing statement for the 2004

through 2005 policy term provided that the total annual premium for Marmillion's policies was

$7782.00.[7]  (Ex. F to Pl.'s Resp.).  The total premium for the Mississippi homeowners policy was

$3622.00.

     The second billing statement included all four policies.  The revised total annual premium

for all four policies was listed as $12,628.00.  The minimum amount due for all of the policies

under this statement was $7576.80, or sixty percent of the total annual premium for the four

policies.  Therefore, this statement covered the first two installments due to the fact that payment

had not been received for the first installment before the statement was issued.  Willis forwarded

the first two billing statements to Marmillion at her request, and the statements were paid with

two checks signed by Marmillion's fiancé that were dated November 19, 2004.  (Ex. G, N to

AIG's Reply).

     Prior to the issuance of the third billing statement, one of the Mercedes was deleted from

---

[7] The automobile policy was not included in this statement.

the automobile policy and the excess policy.  This change caused the annual premium for the

automobile policy to be changed from $4846.00 to $2227.00.  Marmillion's payment of the first

two installments had resulted in the allocation of $2907.60 to the automobile policy.  Therefore,

Marmillion had paid the entire annual premium for the automobile policy as well as an additional

$680.60 after only the second installment.  The deletion of the automobile also resulted in a

$107.00 reduction in the annual premium for the excess policy.

> The second page of each billing statement provided:
>
> If a coverage adjustment to one policy has resulted in a credit, that credit will
> first be applied to open balances on the other policies.  Any remaining credit
> amount will then be refunded to you.  If all other policies listed on this invoice
> are paid in full, you will receive a refund check for the full return premium.

(Ex. H to Pl.'s Resp.).  The second page also contained an installment schedule that provided that

the amount due for all of the policies was $344.80 and that the amount previously paid toward

the third installment was $-1126.00, resulting in an outstanding balance of $1470.80.  While

Marmillion claims that the $344.80 figure demonstrates that AIG overbilled her, AIG provided

the following explanation to the Court in an affidavit:

> In the third row of the installment schedule, it is noted that the "amount due"
> is $344.80.  That number was calculated by taking the $-1126.00 balance for
> the third period of the automobile policy after the premium adjustment and
> adding to that balance $248.80 (the post-endorsement balance for the third
> installment of the excess liability policy), $724.40 (the balance for the third
> installment of the [Mississippi] policy), and $497.60 (the balance for the third
> installment of the Louisiana homeowners policy).  The $344.80 "amount due"
> is meaningless to the insured, because the resulting balance of $-1126.00 from
> the premium adjustment was carried forward to the fourth installment period
> to pay the final installment of the automobile policy, as reflected on page 2 of
> the January 21, 2005, billing statement.  The correct balance due as of January
> 21, 2005, for the excess liability and two homeowners policies was $1470.80,
> as reflected in the column entitled "Outstanding Balance" on page two of the
> billing statement and on page one in the section entitled "Current Amount

Due."

(Ex. I to AIG's Reply).

It is undisputed that Marmillion did not receive the third billing statement, a reminder

notice sent regarding that statement, or the fourth billing statement.  However, Marmillion admits

that she received a Notice of Cancellation regarding the Mississippi homeowners policy at her

Arkansas address prior to the effective date of the cancellation, April 6, 2005.  (Ex. B to AIG's

Mot. at 94).  The Notice of Cancellation stated:

> We are cancelling this policy.  Your Insurance will cease on the Date of
> Cancellation shown above [04/06/2005, 12:01 A.M. Eastern Time].  The
> reason for cancellation is due to non-payment of premium.  The amount due is
> $724.40.

(Ex. I to AIG's Mot.)  The policy covering her Mississippi house was canceled on April 6, 2005.

A Notice of Cancellation was also sent regarding the Metairie policy, providing that it would be

canceled on April 1, 2005.  Both Notices of Cancellation were dated March 21, 2005.  The policy

covering Marmillion's Metairie house was canceled for nonpayment of premium on April 1,

2005.  (Ex. J to AIG's Mot.)  AIG attempted to send a check to Marmillion, refunding unearned

premiums for the two homeowners policies, but the check was never cashed because it was sent

to the incorrect address.  (Ex. T to Pl.'s Resp. at 36-42,122-23).[8]

It is undisputed that Marmillion made no further payments on her policies until after

Hurricane Katrina damaged her house.  However, Marmillion asserts that the $680.60 credit that

---

[8] The unearned premium for the Metairie policy was $439.60, and the unearned premium
for the Mississippi policy was $417.20.  (Ex. K to AIG's Mot. at ¶26).  AIG's Assistant Vice-
President of Billing Operations has testified in an affidavit that "it is [AIG's] custom and practice
not to transfer or refund unearned premiums for at least ten days after they occur. . . ."  (*Id.* at
¶27).  Therefore, since the Mississippi policy was canceled five days after the Metairie policy, the
unearned premium for the Metairie policy was not applied to the Mississippi policy.  (*Id.*)

resulted from the deletion of the Mercedes should have been applied to the Mississippi homeowners policy.  AIG asserts that it is its custom and practice to apply credits to the policy with the lowest balance first, paying that policy in full.  (Ex. K to AIG's Mot. at ¶19).  If there is still a credit remaining, that remaining credit is then applied to the policy with the next lowest balance.  The automobile policy had been paid in full as a result of the premium adjustment.  The excess policy had a remaining balance of $561.80; the Metairie policy had a balance of $995.20; and the Mississippi policy had a remaining balance of $1448.80.  Therefore, the excess policy, which had the lowest balance, was paid in full, and the remaining credit of $118.80 was applied to the Metairie policy, which had the lowest balance after the excess policy was paid in full.[9]

Marmillion wrote out a check to AIG in the amount of $7576.80[10] and dated the check August 15, 2005, but she did not send it to AIG until after Hurricane Katrina had damaged the Mississippi house.[11]  (Ex. M to Pl.'s Resp.; Ex. B to AIG's Mot. at 123-24).  On the memo line of the check, she wrote: "policys [sic] 49009314 and 6917002 subject to refund for overpayment."  (Ex. M to Pl.'s Resp.)

Marmillion also filed a claim with AIG, seeking coverage for the damage caused by Hurricane Katrina to her house.  AIG denied her claim, asserting that the policy was canceled before the hurricane for nonpayment of premium.

---

[9] Marmillion asserts that it was improper for AIG to use the credits to fund the excess policy before its underlying policies were fully funded.

[10] She enclosed the second billing statement with the check.  That billing statement provided that the installment due for all of her policies was $7576.80.

[11] Marmillion sold the Metairie house prior to Hurricane Katrina, and therefore, the cancellation of the policy concerning that house is not at issue in this lawsuit.

AIG sent a refund to Marmillion on October 4, 2005, in the amount of $7576.80, noting that her homeowners policies were canceled in April.  (Ex. 13 to Ex. I to AIG's Reply).  AIG sent another check to Marmillion in October of 2005 in the amount of $8433.60.  (Ex. K to AIG's Mot. at ¶29).  AIG contends that the $8433.60 check was sent in error.  (*Id.*)  It explains that the $7576.80 check was processed manually, and thus, there was no record of the check in AIG's computer system.  (*Id.*)  As a result, the computer system automatically generated an additional refund check that included the $7576.80 refund of the payment made by Marmillion after the hurricane as well as the refund of the unearned premiums for the two canceled policies, which totaled $856.80.  (*Id.*)  Thus, AIG claims that it accidentally overpaid Marmillion as a result of its billing error.  (*Id.*)  However, Marmillion contends that the additional check supports her assertion that she had sufficient credits on her policies that were sufficient to fund the Mississippi policy.

Marmillion testified that she frequently received notices of cancellation from AIG as a result of the failure to change her address.[12]  (Ex. B to AIG's Mot. at 222-23).  She also stated that she felt like the cancellation notices were always sent in error because she did not believe she owed AIG any money.  (*Id.* at 205-06, 211, 223).  She explained that she felt that she was entitled to credits on her account, but she was uncertain as to the amount of the credits.  (*Id.*)  In support of her assertion, she has submitted the report of Olie Jolstad, who has opined that there were sufficient credits on the account to fund the third premium installment for the Mississippi homeowners policy.  However, Jolstad testified that he was not able to determine the exact

---

[12] Marmillion also claims that she asked Cathy Guilfo to send her a copy of the third billing statement approximately four or five times after she received the Notice of Cancellation, but Guilfo never sent the bill.  (Ex. A to AIG's Mot. at 97-98).

amount of credits that existed on Marmillion's account.[13]

Marmillion filed this lawsuit against AIG, seeking a declaratory judgment that she is entitled to coverage under the Mississippi homeowners policy, and alleging a breach of contract claim and a tortious breach of the implied covenant of good faith and fair dealing claim.  She also sued Willis, alleging breach of fiduciary duties, negligence, and malpractice.  AIG filed a counterclaim against Marmillion, seeking a declaratory judgment that she is not entitled to coverage under the policy.  AIG filed a Motion for Summary Judgment, asserting that it is entitled to a judgment in its favor as a matter of law because it properly canceled the policy for nonpayment of premium.  Alternatively, AIG argues that it is entitled to summary judgment with regard to Marmillion's bad faith claim because AIG had an arguable or legitimate basis to deny her claim.

## DISCUSSION

Any party to a civil action may move for summary judgment upon a claim, counterclaim, or cross-claim as to which there is no genuine issue of material fact and upon which the moving party is entitled to prevail as a matter of law.  FED. R. CIV. P. 56.  A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted.  *Celotex Corp.*, 477 U.S. at 324-25.  The non-moving party may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing the existence of a

---

[13] AIG has filed a Motion to Exclude Jolstad's report and proposed testimony.

genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57 (1986).

**I.  The Failure to Send Billing Statements to the Correct Address**

"Insurance policies are contracts, and as such, they are to be enforced according to their

provisions....  When parties to a contract make mutual promises (barring some defense or

condition which excuses performance), they are entitled to the benefit of their bargain." *Anglin*

*v. Gulf Guar. Life Ins. Co.*, 956 So. 2d 853, 859 (¶16) (Miss. 2007) (quoting *Noxubee County*

*Sch. Dist. v. United Nat'l Ins. Co.*, 883 So. 2d 1159, 1163 (Miss. 2004)).  When the words of an

insurance policy are plain and unambiguous, the court will afford them their plain, ordinary

meaning and will apply them as written, but ambiguous or unclear policy language must be

resolved in favor of the insured.  *Anglin*, 956 So. 2d at 859.

With regard to cancellation, the Mississippi policy provides:

P.  Our Cancellation
    To cancel this policy we must notify you in writing.  This notice will
be mailed to you at the last mailing address shown on the Declarations Page
and we will obtain an [sic] U.S. Postal Office certificate of mailing.  This
notice will include the date the cancellation is to take effect and the reason for
cancellation.  It shall also state that any excess premium, if not returned, shall
be refunded on demand.  In the event of cancellation by you or by us, we will
refund any unearned premium on the effective date of cancellation by you or
by us, we will refund any unearned premium on the effective date of
cancellation, or as soon as possible afterwards.  The unearned premium will be
computed *pro rata* for the unexpired term of the policy.

We may cancel this policy subject to the following conditions:
1.  Nonpayment of Premium
If you fail to pay the premium by the date it is due we may cancel this policy
with {ten} 10 days notice, whether the premium is due to us, to our agent, or
under any finance or credit plan.

(Ex. P to AIG's Mot. at 18).

AIG argues that its failure to send billing statements to the correct address is immaterial

because Marmillion received the Notice of Cancellation and failed to pay the premium owed at

that time.[14]  However, Marmillion and Willis[15] assert that AIG had a duty to provide Marmillion

with a separate billing statement because the Declarations Page of the policy provides: "You will

be billed separately for any premium due."  (Ex. P to AIG's Mot. at 3).  In support of this

argument, Willis relies on *American Western Life Insurance Co. v. Hooker*, 622 P.2d 775 (Utah

1980), and *Jenkins v. MBL Life Assurance Corp.*, CIV. A. No. NAR 85-4100, 1987 WL 5851 (D.

Md. Jan. 21, 1987).[16]  In *Hooker*, the Court held that the insurer had a duty to send billing

statements to the insured where the application for insurance, which was a part of the policy

provided: "send premium notice."  *Hooker*, 622 P.2d at 779-80.  Since the insurer failed to send

billing statements to the correct address, the Court held that the policy did not lapse due to

nonpayment of premium.  *Id.* at 780.  The Court noted that the insurer had attempted to send the

insured notice that the policy had lapsed, but the Court did not consider the notice to be a

premium notice.  *Id.*  The relevant facts and holding in the *Jenkins* decision are almost identical

to that in *Hooker*.  *See generally Jenkins v. MBL Life Assurance Corp.*, CIV. A. No. NAR 85-

4100, 1987 WL 5851 (D. Md. Jan. 21, 1987).

    This Court agrees that, at the least, a genuine issue of material fact exists regarding

---

[14] The parties disagree over whether the problems regarding Marmillion's billing address were the fault of AIG, Willis, or both.

[15] Willis filed a response in opposition to AIG's Motion for Summary Judgment.  Willis contends that the alleged improper cancellation of the policy and the subsequent denial of Marmillion's claim are the fault of either AIG or Marmillion, not Willis.

[16] Marmillion did not cite any cases in support of this particular argument.  Neither this Court nor the parties have located any Mississippi authorities discussing this issue.  Thus, this Court must look to authority from other jurisdictions.

whether AIG assumed a duty to provide Marmillion with a separate billing statement due to the language on the declarations page of the policy.[17]   However, since Marmillion received a Notice of Cancellation before the policy was canceled, this Court must also consider whether the Notice of Cancellation could be considered a billing statement.   Neither the Court nor the parties have located any authority that addresses this precise issue.   The Notice of Cancellation provides the amount Marmillion owed regarding the Mississippi homeowners policy, but the Notice arguably does not invite Marmillion to pay that amount in order to avoid cancellation.   Therefore, the Court finds that a genuine issue of material fact exists regarding whether the Notice of Cancellation could be considered a billing statement.   As a result, AIG's Motion for Summary Judgment must be denied in this respect.[18]

**II.  Bad Faith**

Alternatively, AIG asserts that it is entitled to summary judgment with regard to Marmillion's bad faith claim.   To recover punitive damages for bad faith denial of an insurance claim, an insured "must show that the insurer denied the claim (1) without an arguable or legitimate basis, either in fact or law, and (2) with malice or gross negligence in disregard of the insured's rights."   *Broussard v. State Farm Fire and Cas. Co.*, 523 F.3d 618, 628 (5th Cir. 2008) (quoting *U. S. Fid. & Guar. Co. v. Wigginton*, 964 F.2d 487, 492 (5th Cir. 1992)).   The insurer

---

[17] In opposition to the arguments by Willis and Marmillion, AIG relies on *Black v. Aetna Insurance Co.*, 909 S.W. 2d 1 (Tenn. Ct. App. 1995), and *Kitchen v. Dairyland Insurance Co.*, 2006 WL 1523154 (N.D. W. Va. June 2, 2006).   However, the Court finds that these cases are not persuasive because there is no mention in either case of a policy provision in which the insurer allegedly agrees to provide a separate billing statement.

[18] It is not necessary for the Court to address the parties' arguments regarding whether premium credits were properly applied to Marmillion's policies or the parties' arguments regarding whether Willis was AIG's agent.

"need only show that it had reasonable justifications, either in fact or in law, to deny payment."
*Id.* "The fact that an insurer's decision to deny benefits may ultimately turn out to be incorrect
does not in and of itself warrant an award of punitive damages if the decision was reached in
good faith." *Liberty Mutual Ins. Co. v. McKneely*, 862 So. 2d 530, 533 (Miss. 2002).

Marmillion asserts that AIG conducted a "sham investigation" of her insurance claim and
denied the claim after learning that the bills were sent to the incorrect address and that she had
"unapplied" premium credits. However, the Court finds that AIG had an arguable and legitimate
basis for denying Marmillion's claim. Specifically, Marmillion received a Notice of Cancellation
that told her the amount owed on her policy and notified her that her policy would be canceled,
but she waited over four months, until after a hurricane had damaged her house, to make the
payment. Additionally, the Court has thoroughly reviewed the documents produced by the
parties and the arguments and calculations made by Counsel concerning the application of credits
to Marmillion's account. Although the Court recognizes that AIG's billing policies concerning
application of credits are confusing and complicated, AIG had a legitimate and arguable basis for
determining that its cancellation of the policy was proper. Furthermore, there is no indication
that AIG acted with malice or gross negligence in disregard of Marmillion's rights. AIG has
demonstrated that it merely followed its billing policies, and it reasonably believed that
Marmillion had chosen not to continue to fund her policy until her house was damaged.
Although a jury may ultimately find that AIG's cancellation of the policy was improper,
reasonable minds would agree that AIG did not act in bad faith when it denied Marmillion's

-12-

claim under these circumstances.[19]  Therefore, AIG is entitled to summary judgment regarding

Marmillion's bad faith claim.

      **IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion for Summary

Judgment [115] filed by the defendants, American International Insurance Company and AIG

Marketing, Inc., should be **GRANTED** as to Marmillion's bad faith claim and **DENIED** in all

other respects.

      **IT IS FURTHER ORDERED AND ADJUDGED** that the Motion to Exclude Certain

Expert Testimony of Wayne Davidson [117] filed by the defendants, American International

Insurance Company and AIG Marketing, Inc.,  is **GRANTED**.

      **SO ORDERED AND ADJUDGED** this the 1st day of October, 2008.


                        s/ *Louis Guirola, Jr.*

                        LOUIS GUIROLA, JR.
                        UNITED STATES DISTRICT JUDGE

---

[19] Marmillion and Willis also rely on the opinion of Willis' expert, Wayne Davidson, that AIG did not have a reasonable basis to deny the claim.  AIG has filed a Motion to Exclude [117] this proposed testimony by Davidson.  The Court finds that the Motion to Exclude should be granted, because the opinion is a legal conclusion that is not helpful to the Court.  *See Broussard*, 523 F.3d at 628 (explaining that the question of whether an insurer had an arguable basis for denying a claim is "an issue of law for the Court"); FED. R. EVID. 702 (providing that proposed expert testimony must be helpful to the trier of fact).